907 So.2d 704 (2005)
BANCO INVERSION, S.A. and Bayerische Hypo-Und Vereins Bank, AG, Appellants,
v.
CELTIC FINANCE CORPORATION, S.A., Appellee.
No. 4D03-3382.
District Court of Appeal of Florida, Fourth District.
August 3, 2005.
*706 Jack R. Reiter and Robin Corwin Campbell of Adorno & Yoss, LLP, Miami, for appellants.
Chris Keith, Fort Lauderdale, for appellee.

ON MOTION FOR REHEARING
STONE, J.
Appellants' motion for rehearing is denied. However, we withdraw our opinion of March 9, 2005, and substitute the following opinion in its place.
Banco Inversion, S.A., a Spanish company (Banco), appeals a non-final order denying a motion to dismiss for lack of long-arm jurisdiction. The plaintiff, Celtic, is a Panamanian corporation registered to do business in Florida. Its place of business is in Broward County. The company has never done business out of any other location. Its principal, Henry Forero, is a Florida resident.
Banco asserts that it is not subject to personal jurisdiction in Florida, that Florida lacks venue over Celtic's claims, and that the court also erred in denying Banco's motion to dismiss on forum non conveniens grounds.
Celtic's claims include breach of oral contract, quantum meruit, fraud, and interference with contract. Celtic contends that Banco, in June 1999, retained Celtic as a business consultant and to prepare for placing bonds to be issued by Banco and sold in Europe. According to Celtic, the parties entered into an oral agreement for services to be rendered by Celtic. Banco initially contacted Celtic by fax, and the agreement was later reached by telephone. *707 Banco agreed to pay for consulting services at an hourly rate and to reimburse expenses. Celtic asserts that all payments were to be made to Celtic in Florida. The parties also initially agreed that Celtic would have exclusive rights to manage the offering.
From June through September 1999, Celtic provided more than 150 hours of consulting services at its Florida office, including holding extensive telephone conferences with Banco and received over 500 calls and faxes from Banco. It also consulted during two visits to Banco's offices in Europe. Celtic contacted and arranged for other U.S. financial service firms to participate with it, and also arranged for the bonds to be printed.
Subsequently, in October 1999, the parties executed a document referred to as a "letter agreement," signed in Spain, providing for Celtic's managing and coordinating bond dealers in a syndication to market the bonds. This brief letter agreement made no mention of the services rendered by Celtic pursuant to the initial oral contract.
In January of 2000, Bayerische Hypo-Und Vereins Bank, AG, a German company (HVB), purchased Banco, which resulted in its terminating the Celtic relationship. Celtic alleged that Banco fraudulently misrepresented to it that the forthcoming issuance of the bonds was certain. Celtic also alleged that HVB knew of, and tortiously interfered with, the Banco/Celtic agreements and that Banco intentionally withheld the fact that it was seeking to sell the company, which would obviate the need for the bond funding.
We conclude that the trial court did not err in finding Florida had personal jurisdiction over Banco, applying the two-step inquiry recognized in Venetian Salami Co. v. Parthenais, 554 So.2d 499, 502 (Fla.1989). Pursuant to Venetian Salami, the court must determine whether the complaint pleads jurisdictional facts in order to sufficiently "bring the action within the ambit of the [long-arm] statute." Id. If so, the court must then engage in the second step of the analysis and determine whether there exists minimum contacts between Florida and the non-resident or, essentially, whether the non-resident "should reasonably anticipate being haled into [Florida] court." Id. at 500 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). Where the defendant files affidavits in support of its position, the burden is on the plaintiff to show by affidavit the basis for jurisdiction. OSI Indus., Inc. v. Carter, 834 So.2d 362, 364 (Fla. 5th DCA 2003). This court reviews the trial court's denial of Banco's motion to dismiss de novo. Wendt v. Horowitz, 822 So.2d 1252, 1256 (Fla.2002).
It must be noted that neither party sought to schedule an evidentiary hearing in the trial court to resolve any conflicts in their respective affidavits. Banco also does not raise trial court's the failure to hold an evidentiary hearing as an issue on appeal, although it does request in its brief that if this court does not dismiss, that we remand for an evidentiary hearing. There was a hearing at which the court considered the representations of counsel together with affidavits. There was no objection to this procedure.[1]
*708 The record reflects that Banco contacted Celtic, in Florida, and Celtic agreed to provide its services to Banco. It is further uncontested that, while Celtic traveled to Spain and rendered consulting services at Banco's Spanish offices, Celtic also logged extensive hours of consulting and performed other services from its Florida offices. Banco does not deny that Celtic may be entitled to compensation for the services rendered in Florida.
Section 48.193(1), Florida Statutes, provides that a non-resident of the state submits to the jurisdiction of a Florida court for any cause of action arising from a variety of acts taken within the state. These acts include:
(a) Operating, conducting, engaging in, or carrying on a business or business venture in this state of having an office or agency in this state.
(b) Committing a tortious act within this state.
* * *
(g) Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.[2]
§ 48.193(1)(a)-(b), (g), Fla. Stat. (2003).
Celtic, by pleading and affidavit, asserts breach of an oral contract, an agreement to make payments (including an hourly rate for senior advisors), an agreement to reimburse expenses, and failure to pay. Celtic asserts that the agreement called on it to perform services which, as contemplated, it performed in Florida and elsewhere, involving numerous contacts by telephone and fax with Banco, meetings with third parties, and other preparations for the bond issue, as well as Banco's failure to pay. Payment of these services were to be made in Florida, and there is no indication that it was payable anywhere other than Florida. See, e.g., Unger v. Publisher Entry Serv., Inc., 513 So.2d 674 (Fla. 5th DCA 1987); Pellerito Foods, Inc. v. Am. Conveyors Corp., 542 So.2d 426 (Fla. 3d DCA 1989).
We recognize that although the complaint alleges breach of contract, it does not explicitly reference section (1)(g). However, this is not significant where the complaint otherwise alleges sufficient jurisdictional facts. See Stewart v. Julana Dev. Corp., 678 So.2d 1385 (Fla. 3d DCA 1996).
It is clear that, although failure to make payment, alone, is not sufficient to bring a breach of contract claim within the ambit of section (1)(g), the failure to make payment, taken together with other facts, here, of services performed in the state and which could reasonably be anticipated to be performed in this state, is sufficient to prove that the defendant breached a contract in Florida by "failing to perform acts required by the contract to be performed in this state." Venetian Salami; Armaly v. Practice Mgmt. Assoc., 533 So.2d 920 (Fla. 2d DCA 1988); Ganiko v. Ganiko, 826 So.2d 391 (Fla. 1st DCA 2002); Unger.
The trial court also did not err in finding that Banco had the requisite minimum contacts with Florida. Section 48.193(2), Florida Statutes, provides that "[a] defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, *709 whether or not the claim arises from that activity." In analyzing whether a non-resident has the requisite minimum contacts with a forum state to justify personal jurisdiction, courts should determine whether the non-resident's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp., 444 US. at 297, 100 S.Ct. 559. In determining whether a non-resident satisfies the minimum contracts test, courts consider such factors as prior negotiations, expected future services, the contractual obligations of the parties, and the course of dealing between the parties. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).
In Ben M. Hogan Co. v. QDA Investment Corp., 570 So.2d 1349, 1350 (Fla. 3d DCA 1990), Hogan, an Arkansas corporation, contacted QDA, an investment banking firm doing business in Florida. The two agreed that QDA would assist Hogan in seeking financing to broker a two million dollar promissory note, possibly to foreign investors. Hogan maintained a relationship with the Florida firm through telephone calls, letters, and faxes. Id. The Third District affirmed the lower court's denial of Hogan's motion to dismiss. Id. at 1350-51. Further, notwithstanding that the two litigants had agreed that QDA would focus a substantial part of its search for investors outside of Florida, the court recognized that QDA still performed services on behalf of Hogan in Florida. Id. at 1351. Therefore, the facts indicated that Hogan "purposefully availed itself of the privilege of conducting business in Florida and must now answer for the consequences of that privilege in a Florida court." Id.
In Industrial Casualty Insurance Company. v. Consultant Assocs., Inc., 603 So.2d 1355, 1356 (Fla. 3d DCA 1992), the appellant, a foreign corporation, contacted the appellee, a Florida corporation, for the purpose of obtaining its data conversion services. There, the appellant initially contacted the appellee at its Florida office and continued written communication with the appellee for the purpose of outlining and approving the agreement between the parties. Id. Since a substantial amount of services were performed in Florida, the court found the appellant had the requisite minimum contacts and purposely availed itself of the privilege to conduct business in Florida. Id. at 1357.
Here, Banco made the initial contact, and maintained the relationship with Celtic, through extensive letters and telephone calls. It is uncontested that, while Celtic traveled to Spain twice and rendered hundreds of hours of consulting services at Banco's Spanish offices, Celtic also logged hundreds of hours in consulting and other services from its Florida office.
Because we have confirmed jurisdiction under subsection (g), we do not reach whether Banco's oral contract with Celtic falls within the purview of section 48.193(1)(a), Florida Statutes.
We recognize that the October letter agreement included a forum selection clause, which stated:
This agreement-letter will be governed by the laws of Spain and the parties submit irrevocably to the jurisdiction of the judges and courts of Madrid in everything concerning the compliance with the interpretation of the content thereof.
The trial court did not err in rejecting Banco's argument that the forum selection clause dictated that Spain was the required forum as to the issues raised in this complaint. The trial court reasoned that the short letter agreement contained no integration clause and dealt with only one, *710 limited, aspect of the parties' relationship. The agreement covered only the subsequent management and coordination of the bond dealers, which is unrelated to the claims arising out of the prior oral contract for consulting work and printing of the bonds, or claim for quantum meruit compensation based on the same facts.
We also affirm the trial court's denial of Banco's motion to dismiss for forum non conveniens. The record reflects that the trial court considered the factors set forth in Florida Rule of Civil Procedure 1.016(a). In its order, the court identified the application of the rule, determining that Florida had personal jurisdiction and that factors of both private and public interest did not favor a transfer of the case to Spain. Further, the transcript of the hearing on Banco's motion to dismiss reveals that both parties fully apprised the trial court of the facts in rule 1.061, each having the opportunity to make arguments as to the factors. Finally, at the hearing, the court expressed its consideration of the private interest factors, stating that "[f]orum non conveniens doesn't seem to be a factor. Seems like flying from Miami to Madrid or Fort Lauderdale to Madrid by either side imposed no hardship...."
Generally, a presumption favors a plaintiff's choice of forum; however, the presumption may be overcome if the forum would disadvantage the defendant's private interests. Kinney Sys., Inc. v. Cont'l Ins. Co., 674 So.2d 86, 90 (Fla.1996). Here, the court could find that Banco did not overcome the presumption that the factors of private interest favored Florida. First, the affidavit submitted by Celtic stated that Celtic is a small corporation with "limited financial resources" and would suffer prejudice from the expensive travel to Spain. Further, Celtic's claims arose in Florida. The record shows that although Celtic traveled to Spain on two prior occasions, Banco agreed to reimburse all the expenses incurred in Celtic's rendering of consulting services to Banco, some of which occurred here and some in Spain. While Banco, in an affidavit, contended that six witnesses it intended to call were located in Spain, it also listed six other witnesses from various other European countries; Celtic named eight Florida-based witnesses that it intended to call, as well as two witnesses from New York and one witness from California. As the court expressly found, travel posed no more of a hardship on either party. Therefore, the conclusion that Banco did not overcome the presumption that private interest factors favored holding the trial in Florida is reasonable.
Unless a court finds that the private interest factors are overwhelming in one party's favor, a court must also consider public interest factors. Kinney, 674 So.2d at 91-92. Generally, when examining public interest factors, a court's inquiry should focus on "whether the case has a general nexus with the forum sufficient to justify the forum's commitment of judicial time and resources to it." Id. at 92. Here, there is a sufficient nexus between the cause of action on the oral contract and the state of Florida.
We dismiss HVB's appeal of the denial of its motion to dismiss Celtic's claim for tortious interference, as the order, as to the HVB claim, is not an appealable non-final order under Florida Rule of Appellate Procedure 9.130. Peavy v. Parrish, 385 So.2d 1034, 1035 (Fla. 4th DCA 1980).
HVB also asserts that the trial court should have stayed the claim for tortious interference against HVB. The trial court recognized that the parties had entered into two separate agreements; one, an oral agreement and the other, a written letter agreement. Because the *711 court recognized Celtic's claim that the oral agreement was for a contract separate and distinct from the October 1999 letter agreement, the trial court did not abuse its discretion in finding that the resolution on the issues involving the oral contract did not affect the resolution of separate issues arising from the 1999 letter agreement so as to require a stay of the proceedings. Further, Celtic has agreed to dismiss, with prejudice, all of its claims in this suit arising from the letter agreement.
Therefore, the order is affirmed as to venue on the Banco claims and dismissed, without prejudice, as to HVB.
MAY, J., concurs.
FARMER, J., dissents with opinion.
FARMER, J., dissenting.
And why is Florida lending its stage for this production by a suitor from Panama about affairs in Spain? Why an American stage for an Iberian story set to Iberian music? Why not a Spanish stage? If I'm the one sued, the only American music I hear is of bewilderment: "We're waltzing in the wonder of why we're here."[3]
Today's decision is part of a culture of reading long arm statutes too broadly, one often characterized as exorbitant.[4] The exorbitant reading casts a judicial net over nonresidents, as here, with trivial, negligible or inconsequential contacts with the forum. Whatever its label, this view is contrary to the original conception of minimum contacts as a boundary on judicial jurisdiction.[5] The concept represented only a modest extension of judicial reach to accommodate freer travel and communication at a time when only physical presence within a forum would do. But the expansive view uses International Shoe's eponymous holding to justify suits against nonresidents with only minimal contacts.
Minimum contacts expressed a constitutional constraint allowing nonresidents to be sued solely when they intentionally undertake substantial conduct in a foreign place with a decided purpose to take advantage of another business climate and laws. The term becomes ironic when it fails to constrict jurisdiction to those who voluntarily seek out the right to do business beyond their home borders. Minimum contacts is thus perversely wielded  not as an assurance that a defendant's *712 contact with a forum is weighty enough to justify an expectation about being sued where someone does not livebut instead as an ipse dixit shutting out real analysis.
Today's decision exorbitantly expands the reach of long arm statutes in Florida. A Spanish Bank with no connection whatever to the United States or Florida is allowed to be sued here on the theory that the contact is sufficient from sending faxes and e-mails and making telephone calls to a Panamanian company with an office here leading to a contract outside Florida. In fact there is no explanation as to how such acts could possibly create a real and substantial connection of the Spanish Bank to the United States. That these communications began as inquiries and discussions leading to a contract for marketing a European bond issue elsewhere in the world seems of no consequence, for it is not mentioned. That their contract does not require any performance in this state is also not mentioned. That their contract expressly limits suits to Spain under Spanish law is mentioned but casually dismissed.
We do not learn how the acts of the Bank could be thought purposefully undertaken to profit in Florida. Instead the outcome is founded on a new test, one focusing on in-state conduct of a resident plaintiff rather than activities by a nonresident defendant. There is no discussion as to whether this assertion of jurisdiction over an alien commercial entity might have adverse foreign policy consequences for our national government or for our interests in commercial relations with the rest of the world, especially with the European Union. There is no thought that this kind of exorbitant expansion of jurisdiction might invite retaliation against American business in the European Union and result in barriers against the enforcement of American judgments there.
The ultimate facts betray the error in Florida taking this case. The dispute involves not a single American citizen or law. Neither of the defendants is organized or exists under any State of the United States. No defendant has any office or agents anywhere in the United States, and that includes Florida. No defendant solicits business in the United States, and that means Florida. Defendants only contact with any part of the United States is the isolated instance of communicating with someone here. No American market involved in their transaction. In fact the parties expressly excluded the American market from their agreement.
In sum, this is not an American dispute in any sense. This is really an international conflict between players on a world stage. Yet the court's opinion treats the whole thing as a standard, long arm affair between citizens of one American state against another, involving legal relations affected by one state's law or the other. It is however all of these global things; it is none of these American things.
The outcome in this case is fixed by a single decision of the United States Supreme Court, whose facts, issues, decision and rationale cannot be distinguished. In Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Court addressed a similar long arm jurisdictional dispute involving an alien defendant. In rejecting jurisdiction, the Court admonished the lower courts:
"to consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by [a state] court.... In every case ... those interests, as well as the Federal interest in [the] Government's foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction *713 in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State. `Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'... See Born, Reflections on Judicial Jurisdiction in International Cases, to be published in 17 GA. J. INT'L & COMP. L. 1 (1987)." [e.s., c.o.]
Asahi, 480 U.S. at 115, 107 S.Ct. 1026. Today's decision seems almost eager to find the serious burdens of litigation placed on this Spanish Bank outweighed by nearly nonexistent local interests of a Panamanian company doing business in Europe from an office in Florida.
The law review article mentioned at the end of the Asahi quotation discusses the kind of inquiry commanded by the Supreme Court when jurisdiction is claimed over an alien. As the Asahi Court said, the inquiry must focus on the "serious burdens on an alien defendant" and consider the interests of the other nations against the "minimal interests on the part of the plaintiff or the forum State." Id. The law review article elaborates on the reasons for divergent treatment of alien defendant jurisdictional issues:
"Because exorbitant assertions of judicial jurisdiction by United States courts may offend foreign sovereigns, these claims can provoke diplomatic protests, trigger commercial or judicial retaliation, and threaten friendly relations in unrelated fields. Equally important, exorbitant jurisdictional claims can frustrate diplomatic initiatives by the United States, particularly in the private international law field. Most significantly, these claims can interfere with United States efforts to conclude international agreements providing for mutual recognition and enforcement of judgments or restricting exorbitant jurisdictional claims by foreign states."
Gary B. Born, Reflections on Judicial Jurisdiction in International Cases, 17 GA. J. INT'L & COMP. L. 1, 29 (1987). He suggests that:
"An appropriate way to deal with the risk that assertions of judicial jurisdiction by United States courts will interfere with the nation's foreign relations is to subject these claims to heightened constitutional scrutiny." [e.s.]
Id. As Professor Born then explains:
"International cases not only require a different level of Due Process scrutiny from that applicable in domestic cases, but also demand a different focus of Due Process analysis. For purposes of international law and foreign relations, the separate identities of individual states of the Union are generally irrelevant. In the Supreme Court's words, `[f]or local interests, the several states of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power.'" [e.s.]
Id. at 36. He continues:
"The de minimis importance of individual states of the Union for purposes of international law and foreign relations has important implications for defining Due Process limitations on exercises of judicial jurisdiction in international cases. It suggests inquiring into a foreign defendant's contacts with the United States as a whole, rather than into contacts with a particular state." [e.s.]
Id. at 37. Because "[a] pure national contacts test" could result in some state assertions of jurisdiction when the forum lacked any genuine interest in resolving the dispute, however, the pertinent due process analysis in state law international cases *714 "should look to both state and national contacts." Id. at 41.
We must remember that Professor Born's article bears the tacit imprimatur of the Supreme Court, as evidenced by the obviously favorable citation in Asahi. Under his analysis, the kind of state contact that would suffice in state law cases with alien defendants "would reflect either the forum state's interest in adjudicating the dispute, or the defendant's expectation of suit within the state's courts." Id. at 42. By any measure, those considerations applied to this case show that Florida has utterly no interest whatever in adjudicating this case. They also show that neither defendant could have expected a suit in the United States over this transaction.
The details of the background offer no support to a Florida court. They show that Banco Inversión was exploring the feasibility of a European bond issue in the face amount of 300,000,000.[6] Banco wanted someone to market its bonds to dealers outside the United States on a commission basis.[7] After an exchange of faxes and phone calls between Banco and Celtic Finance in June 1999, Celtic sent representatives to Spain to discuss a possible marketing agreement with Banco.[8]
Banco and Celtic finally agreed to a deal in October 1999. Their agreement gave Celtic the exclusive right to do the marketing, but only after bonds in the aggregate nominal value of 300,000,000 had been issued. Celtic would get a commission of 0.075% on all bonds sold to a dealer. Their agreement provided that the bonds would be widely available but would not be registered in the United States and could not be distributed here. For our purposes, the most important part of their written agreement specified:
"This agreement-letter will be governed by the laws of Spain and the parties submit irrevocably to the jurisdiction of the judges and courts of Madrid in everything concerning the compliance with and interpretation of the contents thereof."
Before the bonds were issued, however, a German mortgage bank[9] took control of Banco. The new corporate leaders decided not to go ahead with the bond issue. It appears that the cancellation of the deal may have left Celtic with expenses it had incurred in making ready to perform the marketing of the bonds. But instead of suing Banco in Madrid as it had agreed to do, Celtic decided to file suit in the United States.
One imagines Celtic's thought processes. We will need a local basis for such a suit. Well, we have our office in Hallandale. Why not use that to sue Banco in Florida? That way, the expense of litigating so far away should make Banco more amenable to settling and paying some of Celtic's expenses. Not to worry if the agreement rather broadly implies that Celtic would bear its own expenses.[10]
*715 There is this little problem, however, of the written agreement's provision requiring that any suit be brought in Spain and decided under Spanish law. What to do? Why not claim that the preliminary discussions were in fact oral agreements that Banco would pay Celtic for consulting services? Because it has its office in Hallandale, Celtic could argue that Banco is subject to suit in Florida for breaching a contract and doing business by communicating with Celtic at its office here. That should fly, right? After all, the only thing Celtic will have to show is a few minimal contacts with Florida. And these contacts were certainly that, weren't they?
Well, uh, no, they're not even that. In fact, as I said, it would give a strikingly perverse import to minimum to think of these contacts as enough for due process purposes. It would ignore the precise text of the written contract even to attempt to argue that the parties ever contemplated jurisdiction in the United States. From the forum selection provision, the only place the parties ever expected for suit was in Madrid.
Under the kind of analysis approved in Asahi, a Florida assertion of jurisdiction over Banco is unjustifiable. Banco has absolutely no national contacts or ties with the United States. Nada. Richts. Rien du tout. And so the burden on Banco to litigate a dispute here in the United States is enormous, involving an alien legal system in another language, a world away from its offices. It is also directly contrary to their agreement. From the nature of the contacts (e-mails, faxes and telephone calls to Celtic in Florida about marketing bonds outside the United States) and the written agreement, Banco demonstrably had no expectations about being sued here. The only place where Banco expected suit to be brought is in Madrid, Spain.
As to the interests of Florida in adjudicating the case, there simply are none. The suit does not involve Florida law, policy or interests. Nothing in the dispute implicates any regulatory power or statutory interest of Florida.[11] No Florida citizen is involved. None of Florida's substantive law will provide the rule of decision on any claim or defense.
Yet in contrast to this lack of Florida law or interests, Celtic agreed to litigate exclusively in Spain under Spanish law. Its defendant is a bank organized under Spanish law based in Spain. The subject of their business dealing is European bonds that cannot be sold in the United States. By any measure, European and Spanish interests hugely dominate over any conceivable American interest.
Banco's contacts with the United States (such as they are) are considerably less than those of the Japanese manufacturer in Asahi. There, 20% of the products Asahi sold to the Chinese assembler ended up in vehicles in California. Yet the Asahi Court expressly held that the Japanese firm did not thereby purposefully avail itself of doing business in the California market even though it knew that 20% of its parts were being used in that state. By the same analysis, it is unreasonable to sue Banco in an American court merely *716 because Banco may owe a commission to Celtic for bond sales in Europe.
To justify jurisdiction in spite of Asahi, Celtic argues that its activities in Florida which were generated by Banco's faxes, e-mails and phone calls make jurisdiction proper over Banco. But the fact that Banco knew that its e-mails, faxes and phone calls might prompt Celtic into action at its Florida office fails to demonstrate the critical element of Banco purposefully availing itself of the privilege of carrying on business in Florida. The functionally indistinguishable argument was made in Asahi where the Court rejected it saying:
"[Even assuming] Asahi's awareness that some of the valves sold to Cheng Shin would be incorporated into tire tubes sold in California, respondents have not demonstrated any action by Asahi to purposefully avail itself of the California market. Asahi does not do business in California. It has no office, agents, employees, or property in California. It does not advertise or otherwise solicit business in California. It did not create, control, or employ the distribution system that brought its valves to California. There is no evidence that Asahi designed its product in anticipation of sales in California. On the basis of these facts, the exertion of personal jurisdiction over Asahi by the Superior Court of California exceeds the limits of due process."
480 U.S. at 112, 107 S.Ct. 1026. Notice that the Court relies on Asahi's activities rather than of the California involvement by the Chinese distributor.
Every one of Asahi's jurisdiction-defeating factors has its clone in this case. Banco does not do business in Florida. Banco has no office, agents, employees, or property in Florida. Banco does not advertise or otherwise solicit business in Florida. Banco did not create, control, or employ the actions of Celtic in Florida. There is no evidence that Banco designed its proposed bond issue in anticipation of sales in Florida or even in the United States. In fact, the parties intended that the bonds not be sold in the United States. None of these parallel considerations involve the conduct of Celtic in Florida.
If it was unreasonable in Asahi to subject the Japanese manufacturer to suit in the United States where Asahi knew that a fixed amount of the parts it manufactured would be used in California, it must be doubly unreasonable to sue Banco in Florida when Banco had expressly and entirely avoided the American market. None of Banco's bonds will be sold in the United States, not even a small percentage. In fact, all Banco has done to get sued here is to talk to someone in Florida about marketing bonds outside the United States.[12]
Celtic attempts to justify jurisdiction on three separate provisions from our long arm statute, but the court sustains only one of them, the allegation that defendants breached a contract requiring performance in the State of Florida.[13] So ill-considered is Celtic's contract theory that it would not be valid even if this were a purely interstate dispute, instead of an international one. The breach of contract provision in Florida law is limited to contracts specifically requiring performance in Florida. See § 48.193(1)(g) ("by failing to perform acts required by the contract to be performed *717 [e.s.] in this state."). Nothing in the written agreement (or for that matter in any oral agreement) requires Celtic to do anything in Florida. The bonds expressly restricted distribution to the world outside the United States. Celtic's end of the contract was to market the bonds but only outside this country. I say again, the contract forbade marketing the bonds in the United States.
Hence the critical inquiry must focus only on Banco's activities. The written contract does not specify or require that Banco render any performance in Florida. Payment of Celtic's commission for marketing the bonds could take place anywhere in the world. In fact, given the nature of this international transaction, the probability is very high that bond dealers would purchase the bonds from Celtic using the multiple currencies available within the European Union. It is thus far more likely that Celtic would simply convert the sales proceeds into a single currency, probably euros, deduct its commission and then remit the balance to Banco. Even if Banco were to make the commission payment directly, it could simply place funds in an account maintained by Celtic anywhere in the world. In short, the reality is that no contract performance of any kind by Banco would ever occur in the United States. The essential point is that no contract performance was required in express contract terms to be done in Florida.
Thus we are left with only the court's conjecture that Banco might perform in Florida by making payment to Celtic here. As even the court recognizes, however, it is settled law in Florida that the mere failure to pay a plaintiff in this state is insufficient to support jurisdiction. See Venetian Salami Co. v. Parthenais, 554 So.2d 499 (Fla.1989) ("we do not believe that the mere failure to pay money in Florida, standing alone, would suffice to obtain jurisdiction over a nonresident defendant."); Unger v. Publisher Entry Serv. Inc., 513 So.2d 674 (Fla. 5th DCA 1987), review denied, 520 So.2d 586 (Fla.1988); and compare Global Satellite Comm. Co. v. Sudline, 849 So.2d 466 (Fla. 4th DCA 2003) (where requirement to pay money in Florida has been coupled with Florida venue selection clause in contract, courts hold that nonresident could reasonably expect to be sued in Florida); Desai Patel Sharma, Ltd. v. Don Bell Indus., Inc., 729 So.2d 453 (Fla. 5th DCA 1999); Dolphin Aviation, Inc. v. High Country Helicopters, Inc., 695 So.2d 811 (Fla. 2d DCA 1997); Jefferson Sav. & Loan Ass'n v. Greenman Group, Inc., 531 So.2d 428 (Fla. 4th DCA 1988); Maritime Ltd. P'ship. v. Greenman Adver. Assocs., 455 So.2d 1121 (Fla. 4th DCA 1984); see also Osborn v. Univ. Soc. Inc., 378 So.2d 873 (Fla. 2d DCA 1979) (holding that mere requirement to pay money to debtor in Florida is not substantial enough to satisfy requirement of minimum contacts). Again, payment in Florida is Banco's single suggested contact with this state, its single alleged breach of contract. Under these cases, it is far from enough.
Celtic attempts to avoid the mere payment rule by relying on other services performed in this state. In the words of the court, Banco may be sued in Florida because Celtic "traveled to Spain twice and rendered hundreds of hours of consulting services at Banco's Spanish offices, [and] logged hundreds of hours in consulting and other services from its Florida office." That is to say, Banco can be sued in Florida for breach of contract because Celtic rendered and logged hundreds and hundreds of hours in Florida. Long arm jurisdiction in Florida is thus justified not by what the nonresident defendant is supposed to have done here but instead by what the resident plaintiff did!
*718 This reasoning is manifestly wrong. The activities of Celtic are irrelevant to whether Banco can be sued here under the Florida long arm statute. Settled law requires the court to focus on whether the contract requires performance by the defendant in Florida. It is a stark rejection of statutory law to rely instead on the conduct of the plaintiff here. Such reliance conflicts with the language of the breach of contract provision in the Florida long arm statute.
In spite of clear and contrary authority, plaintiff selectively relies on a single case to support its theory of operating-a-business-venture in this State. Ben M. Hogan Co. v. QDA Inv. Corp., 570 So.2d 1349 (Fla. 3d DCA 1990). At least in that case, the court relied on evidence that the nonresident defendant "performed its work in Florida and received payment in Florida, and Hogan repeatedly contacted QDA offices in Florida in connection with the performance of QDA's contractual duties." Id. at 1351. Also critical was the fact that QDA was a Florida corporation. Equally significant, the note in that case was to be marketed within Florida.
In contrast to the facts in Ben M. Hogan Co., however, Celtic owes its existence to the law of Panama, not of Florida. Unlike the defendant in Ben M. Hogan Co., Banco has performed no work in Florida, made no prior payments to Florida, and has made no communications to anyone in this state about its own performance of any contractual duty here. The communications to Florida were about Celtic marketing bonds outside the United States. Unlike the contract in Ben M. Hogan Co., the agreement in this case requires no acts in Florida, and in fact prohibited marketing the bonds within the United States. No Banco official ever visited Florida in connection with the venture; Banco maintains no offices or telephone here; Banco solicits no business here. The faxes and phone calls invited Celtic to consider a business venture in the European Union, not in the United States. The written agreement makes it undeniable that the deal was not American. Unlike Ben M. Hogan Co., this agreement has absolutely no connection of any kind with Florida. Clearly the ground of breaching a contract requiring performance in Florida is not sustained by Ben M. Hogan Co.
Equally unavailing is the reliance on Celtic's attempt to bypass the written contract by alleging breach of an oral contract. Celtic alleges there were breaches of simultaneous oral agreements involving the same subject matter, the marketing of the Euro bonds. This, too, runs smack up against settled law.
The general rule in contract law is that when parties place their agreement in writing all prior oral understandings on the same subject are deemed integrated and merged. See Gendzier v. Bielecki, 97 So.2d 604 (Fla.1957) (when parties reduce their engagements to writing in terms creating legal obligations without uncertainty as to the object or extent of the engagement between them, the law conclusively presumes that whole engagement and extent and manner of their undertaking is contained in the writing); Ross v. Savage, 66 Fla. 106, 63 So. 148, 155 (1913) ("`When parties deliberately put their engagement into writing, in such terms as import a legal obligation without any uncertainty as to the object or extent of the engagement, it is, as between them, conclusively presumed that the whole engagement and the extent and manner of their undertaking is contained in the writing.... No other language is admissible to show what they meant or intended, and for the simple reason that each of them has made that to be found in the instrument the agreed test of his meaning and intention'."); Horne v. *719 J.C. Turner C.L. Co., 55 Fla. 690, 45 So. 1016, 1019 (1908) (same); Perry v. Woodberry, 26 Fla. 84, 7 So. 483, 485 (1890) (same); see also Prescott v. Mut. Benefit Health & Accident Ass'n, 133 Fla. 510, 183 So. 311 (1938) (general rule is that no oral agreement between parties, made before or at same time as execution of written contract, is admissible to vary its terms or affect its construction and all such oral understandings are considered waived by and merged into written contract); cf. Peterson v. Howell, 99 Fla. 179, 126 So. 362 (1930) (rule merging prior oral negotiations into written contract applies only to such oral negotiations as concern the subject-matter embraced in the written contract).
Thus in considering whether breaching-contract jurisdiction has been properly alleged, the claim of prior contemporary oral agreements or understandings is invalid because, as a matter of law, there can be no oral side agreement contradicting the written one. As the foregoing cases show, this is true whether there is a specific merger of agreement clause or not. Any reliance on breaching a contract must therefore be analyzed only under the written contract. And the written contract's forum selection clause clearly excludes the United States and its laws. That clause is not uncertain or ambiguous. In the plainest of terms, it says adiós Florida, hola Madrid. So with the forum selection clause controlling, all other theories of Florida jurisdiction are foreclosed.
Courts strive to enforce choice of law provisions. See Manrique v. Fabbri, 493 So.2d 437 (Fla.1986) (holding that forum selection clauses should be enforced in absence of proof that enforcement would be unreasonable or unjust); Dep't of Motor Vehicles ex rel. Fifth Ave. Motors Ltd. v. Mercedes-Benz of N. Am., 408 So.2d 627, 629 (Fla. 2d DCA 1981) ("It is well established that when the parties to a contract have indicated their intention as to which law is to govern, it will be governed by such law in accordance with the intent of the parties."); Hirsch v. Hirsch, 309 So.2d 47 (Fla. 3d DCA 1975) (same). As the Manrique court noted with approval in regard to forum selection provisions:
"The argument that such clauses are improper because they tend to `oust' a court of jurisdiction is hardly more than a vestigial legal fiction. It appears to rest at core on historical judicial resistance to any attempt to reduce the power and business of a particular court and has little place in an era when all courts are overloaded and when businesses once essentially local now operate in world markets. It reflects something of a provincial attitude regarding the fairness of other tribunals."
493 So.2d at 439. Manrique stressed good reasons why an agreement unaffected by fraud should be presumptively valid and be enforced:
"[A]t the very least such clauses represent efforts to eliminate uncertainty as to the nature, location, and outlook of the forum in which parties of differing nationalities might find themselves. Moreover, such clauses might be vital parts of agreements fixing monetary terms, with the consequences of the forum clause figuring prominently in the parties' calculations. ... [F]orum selection clauses provide a degree of certainty to business contracts by obviating jurisdictional struggles and by allowing parties to tailor the dispute resolution mechanism to their particular situation." [e.s.]
Id. Celtic waves off the carefully tailored provisions specifying Spain and Spanish law  which it acceptedas though they were verbal fluff.
*720 Celtic's argument exhibits something rather like scorn for the role of a written agreement. The written contract is treated as though it were inferior to the alleged oral agreement. The perfunctory rejection fails utterly to explain why an oral agreement in these circumstances should dominate the written one. Why would a contrary contemporaneous oral agreement ever trump a written one on the same subject?
Under Florida's choice of law rules, the special role of forum selection and governing law provisions counsels very strongly in favor of their enforcement. Only the most compelling reasons should drive a court to reject the application of such provisions. The fact that the written agreement contains no integration clause is utterly meaningless under Florida law. Celtic's attempt to avoid the written agreement with an alleged contemporaneous oral agreement is inadequate. No legal reason has been shown why the forum selection and choice of law clauses in the written agreement of the parties should not be enforced.
As I said earlier, the outcome is in direct conflict with the Supreme Court's minimum contacts analysis. In Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Court said with remarkable clarity that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." [e.s.]; see also Asahi, 480 U.S. at 109, 107 S.Ct. 1026 ("The `substantial connection' between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State." [e.o., c.o.]); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ("the constitutional touchstone remains whether the defendant purposefully established `minimum contacts' in the forum State."); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) ("The Due Process Clause ... gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." [c.o.]); McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) ("Jurisdiction is proper ... where the contacts proximately result from actions by the defendant himself that create a `substantial connection' with the forum State."); Int'l Shoe Co., 326 U.S. at 310, 66 S.Ct. 154 (conduct of single or isolated items of activities in state not enough to subject corporation to suit on causes of action unconnected with activities there). If a plaintiff's unilateral activity within the forum were binding on a nonresident defendant in long arm analysis, the Due Process Clause would be stripped of any meaning in this context.
In this day of information technology, the physical location of a recipient of faxes, e-mails or phone calls between commercial actors in this world is often fortuitous and irrelevant. The fact that Celtic may have received communications in Florida from Banco barely qualifies as a contact, but surely only a minimal one. This kind of connection hardly meets the standard of a minimum contact as International Shoe used the term. And so, as I asked at the beginning, why in the world (pun intended) is Florida giving a forum to this lawsuit between alien firms, over a purely alien business venture taking place entirely outside the United States, and structured under *721 alien law?[14]
I would reverse.
NOTES
[1] The only record reference in the trial court to an evidentiary hearing is a comment in Banco's reply memorandum of law, served several months prior to the hearing held on its motion to dismiss, to the effect that Venetian Salami requires a jurisdictional hearing where the affidavits cannot be reconciled. At no time was the need for an additional hearing, beyond that scheduled and conducted on July 10, 2003, requested of the court, nor is there any indication that the trial court would have denied such a hearing.
[2] Although section 48.193(1)(g) is not stated in the order as a ground relied on by the trial court, Celtic also asserts jurisdiction under this subsection.
[3] Dancing in the Dark, from THE BAND WAGON (1931), music by Arthur Schwartz, lyrics by Howard Dietz.
[4] See Kevin M. Clermont, "Jurisdictional Salvation and the Hague Treaty," 85 CORNELL L.REV. 89, 95-96, 111-12, 114-16 (1999) (most other countries will not respect U.S. judgments based on exorbitant jurisdiction, such as general jurisdiction based on continuous and systematic contacts); Brandon B. Danford, "The Enforcement of Foreign Money Judgments in the United States and Europe: How Can We Achieve A Comprehensive Treaty?," 23 REV. LITIG. 381, 408 (2004) ("U.S. law permits lawsuits that rest upon jurisdictional bases considered exorbitant abroad and, at the same time, refuses to sanction bases commonly accepted in other countries.... The U.S. idea of minimum-contacts jurisdiction, in addition to perhaps appearing unfair and unpredictable, also suffers from the disadvantage that it can be a nebulous concept to apply."); Willibald Posch, "Resolving Business Disputes Through Litigation or Other Alternatives: The Effects of Jurisdictional Rules and Recognition Practice," 26 HOUS. J. OF INT'L L. 363, 365 (2004) ("Europeans were particularly opposed to the ongoing U.S. practice of recognizing merely `doing business in an American State' as a sufficient basis for exercising U.S. jurisdiction."); Stephen B. Burbank, "Jurisdictional Conflict and Jurisdictional Equilibration: Paths to a Via Media?," 26 HOUS. J. OF INT'L L. 385, 399 (2004) ("certain jurisdictional rules currently applied in American courts are exorbitant.").
[5] Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
[6] At the time this was written, that was more than $400,000,000.
[7] The parties' correspondence refers to the bond issue as the "Programme of Euro Medium Term Notes." I use the term market, but the parties use verbs like syndicate to describe what Celtic would do.
[8] Celtic Finance Corporation, S.A., is organized under the laws of Panama and registered to do business in Florida. Banco Inversión, S.A., is an investment bank organized under Spanish law with its office in Madrid. The fact that Celtic's principal resides in Florida is interesting but has no effect for long arm purposes.
[9] Bayerische Hypotheken und Vereinsbank AG, known as the HVB Group.
[10] The agreement specified that Celtic would pay its own expenses for the travel to Madrid.
[11] Compare Asahi, 480 U.S. at 114-15, 107 S.Ct. 1026, in which the State of California had at least an arguable interest in the safety of its citizens in using the parts made by the Japanese defendant ("The Supreme Court of California argued that the State had an interest in `protecting its consumers by ensuring that foreign manufacturers comply with the state's safety standards.' The State Supreme Court's definition of California's interest, however, was overly broad. The dispute between Cheng Shin and Asahi is primarily about indemnification rather than safety standards."). [c.o.]
[12] It is true that the HVB group is one of the major banking concerns in Europe, with offices also in Hong Kong, Vilnius and Singapore. That hardly renders it subject to suit in the United States, however.
[13] § 48.193(1)(g), Fla. Stat. (2003) ("breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.").
[14] It follows that even if I thought that somehow Florida had jurisdiction, this state would be too inconvenient a place to maintain a suit against Banco. I would harmonize my lyric in the opening paragraph thus: "The claim should be maintained mainly in Spain." A decision denying a forum non conveniens dismissal in favor of a Spanish forum is an abuse of discretion.